# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In the Matter of:                                      Case No. 16-41554

**CADILLAC NURSING HOME, INC.**                        In Proceedings Under
    **d/b/a St. Francis Nursing Center**                Chapter 11

           Debtor.                         Hon. Thomas J. Tucker

_____/

## COVER SHEET FOR
## FIRST DAY MOTION FOR ENTRY OF AN INTERIM AND FINAL ORDER AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL; (B) OBTAIN POST-PETITION FINANCING; (C) GRANT SECURITY INTERESTS, SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND OTHER ADEQUATE PROTECTION UNDER 11 U.S.C. §§ 105, 361, 363(e), AND 364(c); AND (D) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The Debtor filed a motion to use cash collateral and obtain post-petition financing which is attached to this Cover Sheet. In accordance with LBR 4001-2(b) (E.D.M.), the Debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | ____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | ____ Yes<br><br>__X__ No | Page ____, ¶ ____ |

{00621722.1}

| | | |
|---|---|---|
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | __X__ Yes <br><br> _____ No | Page 12, ¶ 18. |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | __X__ Yes <br><br> _____ No | Page 2, ¶ 4. |
| (5) Provisions that prime any lien without that lienholder's consent. | _____ Yes <br><br> __X__ No | Page ____, ¶ _____ |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | _____ Yes <br><br> __X__ No | Page ____, ¶ _____ |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | __X__ Yes <br><br> _____ No | Page 9, ¶¶ 12, 13(d). |
| (8) Provisions for the payment of prepetition debt. | __X__ Yes <br><br> _____ No | Page 6, ¶ 6. |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes <br><br> __X__ No | Page ____, ¶ _____ |
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes <br><br> __X__ No | But see Page 11-12, ¶ 17. |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _____ Yes <br><br> __X__ No | But see Page 11-12, ¶ 17. |

| | | |
|---|---|---|
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | _____ Yes <br><br> __X__ No | But see <br> Page 11-12, ¶ 17. |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | __X__ Yes <br><br> _____ No | Page 12-13, ¶ 19. |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | _____ Yes <br><br> __X__ No | Page ____, ¶ ____ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | _____ Yes <br><br> __X__ No | Page ____, ¶ ____ |
| (16) Provisions that purport to bind a subsequent trustee. | __X_ Yes <br><br> _____ No | Page 14, ¶ 23 |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | __X__ Yes <br><br> _____ No | Page 4-5, ¶ 3 |

SCHAFER AND WEINER, PLLC

By: /s/ John. J. Stockdale, Jr.
    MICHAEL E. BAUM (P29446)
    JOHN J. STOCKDALE, JR. (P71561)
    JASON L.WEINER (P74120)
    Proposed Counsel for Debtor
    40950 Woodward Ave., Ste. 100
    Bloomfield Hills, MI 48304
    (248) 540-3340
    jstockdale@schaferandweiner.com

Dated:   February 8, 2016

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In the Matter of:                                         Case No. 16-41554

**CADILLAC NURSING HOME, INC.**                 In Proceedings Under
   **d/b/a St. Francis Nursing Center**            Chapter 11

               Debtor.                         Hon. Thomas J. Tucker

_____/

## FIRST DAY MOTION FOR ENTRY OF AN
## INTERIM AND FINAL ORDER AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL; (B) OBTAIN POST-PETITION FINANCING; (C) GRANT SECURITY INTERESTS, SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND OTHER ADEQUATE PROTECTION UNDER 11 U.S.C. §§ 105, 361, 363(e), AND 364(c); AND (D) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Cadillac Nursing Home, Inc. ("Debtor") through counsel, for *Debtor's First Day Motion for Entry of an Interim and Final Order Authorizing Debtor to (A) Use Cash Collateral; (B) Obtain Post-Petition Financing; (C) Grant Security Interests, Superpriority Administrative Expense Status and Other Adequate Protection Under 11 U.S.C. §§ 105, 361, 363(e) and 364(c); and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "DIP Financing Motion"), states:

### CONCISE STATEMENT OF RELIEF REQUESTED

1.      By this Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to obtain post-petition financing pursuant to the DIP Facility, (ii) granting the claims of Mission Point of Detroit, LLC ("Mission Detroit"), the DIP lender, superpriority claim status under 11 U.S.C. § 364(c)(1), (iii) granting Mission Detroit security interests in and liens on the Debtor's pre- and post-petition assets under 11 U.S.C. §364(c)(2)-(3), (iv) authorizing the Debtor to use Cash Collateral and to provide adequate protection to certain secured parties in connection

therewith, (iv) authorizing the Debtor to use the proceeds of the DIP Facility, and (v) scheduling a Final Hearing on this Motion and establishing notice procedures in respect thereof.

2.    The salient terms of the DIP Facility, which are fully contained in the proposed order, are as follows:[1]

| Subject Matter | Relevant Terms | Location in Proposed Order |
|---|---|---|
| Borrower: | Cadillac Nursing Home, Inc. | |
| Lender | Mission Point Of Detroit, LLC | |
| Facility Use and Proceeds | A facility used to fund ongoing operating expenses through the bankruptcy case or until terminated earlier as set forth herein. | Page 4-5, Para. 3. |
| Interest Rate | 5% | Page 4-5, Para. 3. |
| Application of Proceeds | In addition to payments of interest, fees and costs required by the proposed order attached hereto, Debtor is only permitted to make payments consistent with a Budget within a 20% variance. | Page 4-5, Para. 3. |
| Maturity Date | Unless extended by Mission Detroit, the earlier of (i) the effective date of a confirmed plan, (ii) September 2, 2016, or (iii) 60 days after a Termination Event (as defined in the proposed order), or (iv) the acceleration of the amount owed by Debtor due to an Event of Default. | Page 11-12, Para. 17. |
| Priority and Liens | Subject to the Professional Fee Holdback (as defined herein), superpriority administrative claim status pursuant to 11 U.S.C. § 364(c)(1), 503(b) and 507(b). Secured by a perfected security interest pursuant to 11 U.S.C. § 364(c)(2)-(3) in Debtor's pre- and post-petition assets, but exclusive of the proceeds of avoidance actions under 11 U.S.C. § 502(d), 544, | Page 7, Para. 9; Page 8, Para. 11. |

[1] This summary is based on the proposed order, attached as Exhibit A. This summary is qualified in its entirety by reference to the provisions of the proposed order. The Interim Order and Final Order will control in the event of any inconsistency between this Motion and the Interim Order and the Final Order.

| | 545, 547, 548, 549, 550, 551 or 553 (collectively, "Avoidance Actions"). | |
|---|---|---|
| Perfection of Liens | The Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the liens and security interests granted therein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) holding a depository account consisting of collateral (a "Perfection Act"). Notwithstanding the foregoing, if Slavik, the IRS, the Plan Monitor, or Mission Detroit elects for any reason to file, record or otherwise effectuate any Perfection Act, Slavik, the IRS, the Plan Monitor, and Mission Detroit is authorized to perform such act, and the Debtor is authorized and directed to perform and cooperate with such act to the extent necessary, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Order notwithstanding the date and time actually accomplished. The subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Slavik, IRS, the Plan Monitor or Mission Detroit may choose to file, record or present a certified copy of this Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Final Order in accordance with applicable law. No | Page 7-8, Para. 10. |

| | | |
|---|---|---|
| | defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the liens and security interests granted herein. | |
| Adequate Protection for prepetition lenders | (i) Replacement liens on all prepetition collateral, (ii) Superpriority administrative expenses claims, (iii) adequate protection payments in the amount of $9,583.33 per month to Salvik Enterprises, LLC ("Salvick") and $2,503 per month to the Internal Revenue Service ("IRS"). | Page 6, Para. 6; and Page 6-7, Para. 8. |
| Professional Fee Holdback | Subject to the terms and conditions of the proposed order, Cash Collateral and DIP Financing may be used during the case and for 30 days after the occurrence of an Event of Default for the unpaid reasonable fees and expenses of attorneys, accountants and other professionals retained by the Debtor under Section 327 or 1103(a) of the Bankruptcy Code actually incurred, whether paid or accrued, on or after the Petition Date through thirty days after the declaration of the Event of Default subject only to approval by a final order of the Court, (collectively, the "Allowed Professional Fees"), less the amount of any retainers, if any, then held by such Professionals. | Page 9, Para. 13. |
| 506(c) Waiver | No costs or expenses of administration which have or may be incurred in this case at any time shall be charged against Mission Detroit, its claims or collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of Mission Detroit, and no such consent shall be implied from any other action, inaction or acquiescence by Mission Detroit. | Page 12-13, Para. 19. |
| Stipulation as to Prepetition Obligations | Debtor stipulates to the validity, priority and enforceability of the Slavik Indebtedness (as defined herein). | Page 2, Para. 4. |

| | | |
|---|---|---|
| Events of Default | Events of Default include failure of Debtor to comply with the terms of any Order granting this DIP Financing Motion, dismissal or conversion of the case, appointment of a Chapter 11 trustee, failure by Debtor to meet its Budget projections within a 20% cumulative variance, on-going losses by Debtor in an amount unacceptable to Mission Detroit, and confirmation of a plan of reorganization (without Mission Point's consent) that does not provide for payment in full to Mission Point on the effective date of the plan. | Page 10, Para. 15. |
| Remedies upon an Event of Default | After a written declaration of default by Mission Detroit or Slavik to Debtor, Debtor shall have 15 days to cure the Event of Default or to obtain a ruling from the Court declaring that no default has occurred. Upon the occurrence of and during the continuance of an Event of Default not timely cured, (a) all amounts due to Mission Detroit shall become immediately due and payable and Mission Detroit shall have no further obligation to make any advances to Debtor, (b) the Debtor shall continue to be bound by all restrictions, prohibitions and other terms as provided in this Order, (c) Mission Detroit, Slavik, the IRS, and the Plan Monitor shall be entitled to take any act or exercise any right available at law or equity to collect amounts due and owing, including the enforcement of liens and security interests, and (d) the Debtor's authority to use cash collateral under this Order shall terminate. | Pages 11, Para. 16. |
| Waiver of Perfection Requirements | Interim and Final Order provide for automatic perfection of Mission Detroit's liens in the Debtor's post-petition assets. | Page 7-8, Para. 10. |

## JURISDICTION

3.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.

4.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

5.      Venue of this proceeding and the Motion in this District is proper under 28 U.S.C.

§§ 1408 and 1409.

## BACKGROUND

6.      On February 8, 2016 ("Petition Date"), Debtor commenced a voluntary case

under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

7.      Debtor continues to operate its business as debtor-in-possession as permitted

under section §§ 1107 and 1108 of the Bankruptcy Code.[2]

8.      The Debtor operates a privately-owned, fully-licensed, long-term skilled nursing

care facility located in Detroit (the "Facility") with 81 long-term, nursing care beds, of which 64

are currently occupied.

9.      Further details regarding Debtor, Debtor's Facility, and the events leading to this

bankruptcy filing are set forth in the *Declaration of Bradley Mali in Support of First Day*

*Pleadings* (the "Mali Declaration"), filed concurrently with this DIP Financing Motion.

10.     On the Petition Date, the Debtor, without admission, believes that its cash

collateral, as defined in 11 U.S.C. §363 (the "Cash Collateral") consists of the following:

        a.      accounts receivable having a face value of approximately
                $2,598,032.50 as of December 31, 2015, of which $909,983.45 is

---

[2] Unless otherwise specified, statutory references in this Motion are to sections of the Bankruptcy Code.

upon information and belief acknowledged by the payors as collectible[3]; and

    b.    Deposit accounts having negative aggregate balance as of February 8, 2016.

11.    Debtor requires the use of Cash Collateral to continue operating the Facility and to provide quality care for its patients. A two-month budget (the "Budget") is attached as **Exhibit B** and showing Debtor's projected revenues and expenses.

12.    Debtor believes that the cash collateral generated by the operation of its business will be insufficient to pay all of the Debtor's post-petition, on-going expenses including payments to employees and vendors, adequate protection payments, and payments required to fund the administrative expenses of this Chapter 11 case.

13.    During the first thirty days of the case, the Debtor expects that it will need to spend $382,721.13 to avoid immediate and irreparable harm.

14.    Further, the Budget shows a two-month cash funding need of $10,265.76 – half of which ($5,132.88) must be borrowed in the first thirty days of the case to avoid immediate and irreparable harm. However, Debtor anticipates liquidating its assets and winding down, and anticipates that the wind-down costs through the course of this case will require funding substantially in excess of the two-month cash needs shown in the Budget.

15.    The majority of the Debtor's value arises from its Bed Licenses (defined below) and its ability to continue servicing its residents through an orderly liquidation process. Without authority to use cash collateral the Debtor will suffer irreparable harm because, rather than preserving the business's value during an orderly liquidation, it will be forced to immediately shut down its nursing care facility displacing its residents and employees; and upon any such

---

[3] The process of verifying and collecting medical-related receivables is complex. Nothing herein should serve as an admission by the Debtor that any of its receivable are not collectible.

closure will cease to operate as a licensed nursing care facility. Without the use of funds, the Debtor will be unable to obtain all the goods and services needed on a daily basis to operate the nursing home, such as medications, therapy, food, laundry and employees. *See* Mali Declaration.

16.     Before the Petition Date, Mission Detroit entered into a purchase agreement with Debtor to purchase Debtor's bed licenses and operating rights ("Bed Licenses"). Mission Detroit remains interested in purchasing the Bed Licenses and is willing to provide funding to Debtor, subject to the Budget and the terms of this DIP Financing Motion and the proposed Order.

17.     As disclosed in the Mali Declaration, Mission Detroit is owned (i) indirectly, by Roger Mali, the owner of Debtor's management company and the brother of Brad Mali, Debtor's principal, and (ii) the Slavik Company, an entity sharing common ownership with Slavik, a secured creditor of Debtor.

18.     By this Motion, Debtor seeks entry of an interim and final order under 11 U.S.C. § 364 authorizing Debtor to (A) use cash collateral, (B) obtain post-petition financing from Mission Detroit, (C) grant security interests, superpriority administrative expense status and other adequate protection, and (D) schedule a final hearing on this DIP Financing Motion.

## **PREPETITION SECURED DEBT AND DEBTOR'S CASH COLLATERAL**

19.     Slavik asserts, and Debtor acknowledges and agrees, that Slavik holds a claim against Debtor in the approximate amount of $1,275,000, plus interest, costs and fees (the "Slavik Indebtedness") secured by a first priority lien and security interest in all Debtor's assets except Debtor's real property.

20.     The IRS is likely to assert federal tax obligations in the approximate amount of $940,322.34 secured by a second-position lien and security interest in Debtor's receivables and, potentially, Debtor's other assets. Debtor disputes the amount of the IRS claim.

21.     The Plan Monitor[4] is likely to assert a security interest in the Debtor's Cash Collateral in the estimated amount of $130,028.71, which Debtor believes would be junior to the interests of Slavik and the IRS.

22.     Other than Slavik, the IRS and the Plan Monitor, Debtor believes that no other creditor will assert an interest in Debtor's Cash Collateral. To the best of Debtor's knowledge, no other creditor holds a valid and perfected security interest in any of Debtor's assets, other than Debtor's real property.[5]

23.     For purposes of complying with Local Rule 4001-2(a) only, and with full reservation of Debtor's right to assert a different value at any time, Debtor currently estimates the value of the secured interest of (i) Slavik to be approximately $1,275,000, (ii) the IRS to be approximately $720,000, and (iii) the Plan Monitor to be $0 - $100,000.[6] Nothing in this DIP Financing Motion or the proposed order are intended to prejudice in any way the rights of Debtor or any other party to assert a different value of the secured interests in Cash Collateral.

## **DEBTOR'S NEED FOR USE OF CASH COLLATERAL AND FINANCING**

24.     As stated in the Mali Declaration, Debtor intends to liquidate its operations. However, Debtor believes that a controlled liquidation, including the sale of its Bed Licenses to Mission Detroit or any over-bidder, will maximize the value of Debtor's assets for the benefit of all creditors, and will permit Debtor to wind-down its operations in a controlled manner while

---

[4] Defined in the Mali Declaration.

[5] The Wayne County Treasurer and Green Mountain Finance Fund, LLC, among others, may assert liens on or interests in the Debtor's real property.

[6] These estimates are based on the proposed acquisition of bed licenses by Mission Detroit and the liquidation of Debtor's remaining assets. Debtor has not determined a market value for its assets if it liquidates without the proposed sale to Mission Detroit, but believes a total liquidation value above $1.1 million (before liquidation costs) is unlikely. The value of the secured interest of the IRS is set at the approximate amount that Debtor believes is owed to the IRS. Debtor believes the Plan Monitor would be wholly undersecured in the absence of the Mission Detroit purchase but, depending on the costs and expenses of administering the estate and the resolution of the IRS' claim, the Plan Monitor's secured claim may have value if the Mission Detroit purchase is approved.

continuing to provide quality care to Debtor's patients. By contrast, an uncontrolled liquidation would result if Debtor were not permitted to use Cash Collateral and obtain financing, would severely restrict Debtor's ability to obtain any value for its assets and, more importantly, would likely result in an emergency transfer of patients to other facilities which could put the health and well-being of Debtor's patients at risk.

25. The Debtor's ability to continue caring for its patients, to maintain business relationships with vendors and suppliers, to pay employees, and to otherwise fund operations is essential to the Debtor's continued viability and is vital to the preservation and maintenance of the value of the Debtor and/or the Debtor's assets, and the Debtor's ability to conduct an orderly liquidation of its assets to maximize their value for the benefit of its patients and all creditors.

26. Under the Debtor's cash flow projections, as shown on the Budget, Debtor does not have sufficient available sources of working capital, including cash collateral, to operate its business in the ordinary course of their business without the financing requested under this DIP Financing Motion.

27. Accordingly, the Debtor has an immediate need to use cash collateral and obtain post-petition financing in order to, among other things, permit the orderly continuation of the operation of its business, minimize the disruption of business operations, and preserve and to maximize the value of the assets of the Debtor's bankruptcy estate.

## TERMS OF THE PROPOSED FINANCING

28. The terms of the proposed financing are set forth in the attached proposed order, which may be modified or amended at any time (with appropriate notice) prior to entry of the Order as a Final Order, and may be modified or amended thereafter only after notice and an

opportunity for a hearing. The following is only a summary of the proposed financing terms and parties-in-interest are encouraged to review the entirety of the proposed order.

29.     The post-petition financing provided by Mission Point will accrue interest at 5% per annum. In addition to repayment of principal and interest, Debtor will be responsible to pay fees, expenses, and costs of Mission Detroit relating to Mission Detroit's financing of Debtor (including all costs, expenses and attorneys' fees, already incurred or to be incurred, relating to this DIP Financing Motion, the order, and any subsequent, monitoring, negotiation, and enforcement proceedings) (collectively, "Loan Expenses").

30.     Payment of each previous month's interest and Loan Expenses will be due and payable on the seventh day of the following month. Mission Detroit may, in its sole discretion, agree to advance the amount owed for Loan Expenses and interest as payment in kind (a "PIK Advance"), in which event the PIK Advance shall be treated in all respects as any other advance by Mission Detroit and shall be payable on the same terms and accrue interest at the same rate of interest.

31.     Under the attached proposed order, Debtor proposes to provide security to Mission Detroit for its post-petition financing by granting Mission Point the following relief:

    a.     Senior liens and security interests on all Debtor's assets, if any, not
           encumbered by pre-petition liens and security interests;

    b.     Junior liens on all assets of the Debtor subject to pre-petition liens and
           security interests; and

    c.     A superpriority administrative expense claim with priority over all other
           administrative expense claims except Allowed Professional Fees (as
           defined in the proposed order attached as **Exhibit A**).

32.     Notwithstanding the above, Mission Detroit's liens and security interests will not attach to Chapter 5 actions and, in the Event of Default, Mission Point will permit Debtor to

continue using the proceeds of post-petition financing for 30 days to fund certain expenses (as further set forth in the proposed order) to permit Debtor to wind-down its operations in an orderly manner and to protect the health and well-being of Debtor's patients.

33.    Unless extended by Mission Detroit, payment of the post-petition financing will be due in full on the earlier of (i) the effective date of a confirmed plan, (ii) September 2, 2016, or (iii) 60 days after a Termination Event (as defined in the proposed order), or (iv) the acceleration of the amount owed by Debtor due to an Event of Default.

34.    Events of Default include failure of Debtor to comply with the terms of any order granting this DIP Financing Motion, dismissal or conversion of the case, appointment of a Chapter 11 trustee, failure by Debtor to meet its Budget projections within a 20% cumulative variance, on-going losses by Debtor in an amount unacceptable to Mission Detroit, and confirmation of a plan of reorganization (without Mission Point's consent) that does not provide for payment in full to Mission Point on the effective date of the plan.

35.    Termination Events are not Events of Default, but trigger a 60-day period during which Debtor may attempt to obtain alternative financing or fund repayment of the post-petition financing through cash collateral proceeds. Termination Events include failure of Debtor to file a plan that does not pay Mission Detroit in full on the Effective Date, Debtor agrees to sell or seeks to sell the Bed Licenses to any person other than Mission Detroit and that sale does not pay Mission Detroit in full and prevents credit bidding by Mission Detroit or Slavik, Debtor fails to close on a sale of Bed Licenses by July 1, 2016, or Mission Detroit fails to obtain or loses its own source of funding.

## THE PROPOSED USE OF CASH COLLATERAL

36.     As adequate protection for the use of Cash Collateral, Debtor proposes the following:

      a.    Adequate protection payments to Slavik in the amount of $9,583.33 per month and the IRS in the amount $2,503.00, which is the monthly amount due under the Slavik loan document and the estimated interest payment due to the IRS;

      b.    Replacement liens for Slavik, the IRS, and the Plan Monitor in the Debtor's post-petition assets to the extent of any diminution in the value of their interests in the Debtor's pre-petition assets. The replacement liens will have the same priority, scope, validity, and enforceability, and shall attach to the same categories of assets as Slavik's, the IRS', and the Plan Monitor's pre-petition liens and security interests as of the Petition Date;

      c.    Priority administrative expense claims, limited to any diminution in the value of the interests in the Debtor's pre-petition assets, junior only to the superpriority claim of Mission Detroit, and senior to all other administrative expense claims; and

      d.    Further adequate protection as provided in the proposed order including reporting requirements, restrictions on Debtor's activities including adherence to the Budget, and rights upon the occurrence of an Event of Default.

## LEGAL BASIS FOR RELIEF REQUESTED

### A.    Use of Cash Collateral

37.     A debtor may use cash collateral only with approval by the Bankruptcy Court after notice and a hearing, and creditors with an interest in Debtor's Cash Collateral are entitled to adequate protection of those interests. 11 U.S.C. §§ 363(c) and (e).

38.     Debtor believes that the adequate protection granted to Slavik, the IRS, and the Plan Monitor under the proposed order are adequate and sufficient to protect them from diminution in value of their interests in the Debtor's assets. In particular, Debtor submits that the Debtor's pre-petition assets would have little or no value in the context of a forced liquidation

that would result if this DIP Financing Motion were not approved, and the use of cash collateral and post-petition credit are necessary to preserve and maximize the value of Debtor's assets.

39.     Therefore, Debtor requests that the terms of its use of cash collateral be approved.

**B.     Post-Petition Financing**

40.     If a debtor is unable to obtain unsecured credit allowable as an administrative expense under 11 U.S.C. § 503(b)(1), then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses of the kind specified in 11 U.S.C. § 503(b) or § 507(b); or (b) secured by a lien on property of the estate that is not otherwise subject to a lien; (c) secured by a junior lien on property of the estate that is subject to a lien; or (d) secured by a senior or equal lien on property of the estate that is already subject to a lien. *See* 11 U.S.C. § 364(c) and (d).

41.     A debtor need only demonstrate "by a good faith effort that credit was not available" without the protections of Section 364. Bray v. Shenandoah Federal Sav. and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Plabell Rubber Prods. Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley. Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom,* Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 1997, 120 n.4 (N.D. Ga. 1989).

42.     In this case, Debtor has no source of post-petition financing other than Mission Detroit. Even if an alternative lender could be found to finance Debtor's on-going operations, such lender would require a first-position lien and security interest in all Debtor's Cash

Collateral and a substantially higher interest rate, among other terms and conditions which would be more onerous to Debtor and would result in decreased value to all Debtor's creditors.

43.     That Mission Detroit is an affiliate of Debtor's management company and one of Debtor's secured creditors does not prevent Mission Detroit from advancing funds to Debtor under 11 U.S.C. § 364. *See, e.g.,* In re Lewiston Steam & Power Associates, 1989 Bankr. LEXIS 1382 (Bankr. N.D. Ohio Aug. 24, 1989) (holding that section 364 contains no proscriptions against insiders extending credit) (attached as **Exhibit C**). Debtor has fully disclosed that Mission Detroit's willingness to fund in this Chapter 11 case stems exclusively from Mission Detroit's interest in purchasing Debtor's Bed Licenses, and nothing in the proposed order is intended to give Mission Detroit an unfair advantage in bidding on Debtor's Bed Licenses in any future proposed sale process or under a proposed plan.

44.     The terms of the proposed post-petition financing are reasonable and well within the Debtor's business judgment. The rate of interest is reasonable and well under market rates for this type of loan. This lending will permit Debtor time and flexibility to operate its business and ultimately confirm a plan of liquidation. *See, e.g.,* In re Ames Department Stores, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

45.     The post-petition financing agreement is fair and equitable and should be approved.

**WHEREFORE**, Debtor requests that the Court enter an order, substantially in the form attached as Exhibit A authorizing Debtor, on the terms set forth in the proposed order, (i) to use cash collateral, (ii) obtain credit, (iii) grant adequate protection, and (iv) schedule a final hearing.

Respectfully Submitted,

SCHAFER AND WEINER, PLLC

/s/ John J. Stockdale, Jr.
MICHAEL E. BAUM  (P29446)
JOHN J. STOCKDALE, JR. (P71561)
JASON L. WEINER  (P74120)
Proposed Counsel for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
jstockdale@schaferandweiner.com

Dated:  February 8, 2016



In the Matter of:                                          Case No. 16-41554

**CADILLAC NURSING HOME, INC.**                  In Proceedings Under
**d/b/a St. Francis Nursing Center**             Chapter 11

                    Debtor.                                Hon. Thomas J. Tucker

_____/

**INTERIM ORDER AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL;
(B) OBTAIN POST-PETITION FINANCING; (C) GRANT SECURITY INTERESTS,
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND OTHER
ADEQUATE PROTECTION UNDER 11 U.S.C. §§ 105, 361, 363(e), AND 364(c); AND
(D) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

This matter having come before the Court on the *Debtor's First Day Motion for Entry of
an Interim and Final Order Authorizing Debtor to (A) Use Cash Collateral; (B) Obtain Post-
Petition Financing; (C) Grant Security Interests, Superpriority Administrative Expense Status
and Other Adequate Protection Under 11 U.S.C. §§ 105, 361, 363(e) and 364(c); and
(D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "DIP Financing
Motion"), dated February 8, 2016; the initial hearing on the Motion having been held by this
Court on February __, 2016 (the "Interim Hearing"); due and appropriate notice of the DIP
Financing Motion, the relief requested therein, and the Interim Hearing (the "Notice") having
been served by the Debtor in accordance with Rule 4001(c) on (i) Slavik Enterprises, LLC
("Slavik"), (ii) the United States Trustee for the Eastern District of Michigan (the "U.S.
Trustee"), (iii) the holders of the twenty (20) largest unsecured claims against the Debtor's estate
(the "20 Largest Unsecured Creditors"), (iv) the Internal Revenue Service (the "IRS"), (v) Green
Mountain Finance Fund, LLC, (vi) the Plan Monitor, (vii) all appropriate state taxing authorities,
(viii) Mission Point Management Services, LLC, (ix) Mission Point of Detroit, LLC ("Mission
Detroit"), and (x) all other parties identified in the certificate of service filed with the Court,
including all creditors who have filed notices of appearance in this case on or before the filing of
the DIP Financing Motion (collectively, the "Noticed Parties"); and upon the record made by the

{00621255.4}

Debtor at the Interim Hearing including the Motion and related filings and pleadings, and good and sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

1. **Petition**. On February 8, 2016 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its financial affairs as a debtor-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

2. **Jurisdiction and Venue**. The Court has jurisdiction over this proceeding and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334. The DIP Financing Motion is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2). Venue of this bankruptcy case and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

3. **Notice**. Under the circumstances, the Notice given by the Debtor of the Motion, the Interim Hearing, and the relief granted under this Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c).

4. **Debtor's Acknowledgments Regarding the Slavik Indebtedness**. The Debtor acknowledges and agrees that:

    a. Debtor is indebted to Slavik in the approximate amount of $1,275,000, plus accrued interest, costs, and fees (the "Slavik Indebtedness"), and Debtor has no defenses, counterclaims or offsets against the Slavik Indebtedness.

    b. Slavik holds a first-priority lien and security interest in all Debtor's assets except Debtor's real estate, as further set forth in the loan documents executed in connection with the Slavik Indebtedness and the security interests recorded by Slavik (the "Pre-Petition Collateral").

    c. The acknowledgements and admissions contained in this paragraph 4 shall be binding on all parties-in-interest unless an objection is filed within sixty (60) days after entry of this Order, or in the event that an official committee of unsecured creditors (the "Committee") is formed, sixty (60) days after formation of such Committee.

2

5.    **Findings Regarding the Post-Petition Financing**.

     a.    <u>Post-Petition Financing</u>. The Debtor has requested from Mission Detroit, and Mission Detroit is willing to extend, certain post-petition loans, advances and other financial accommodations on the terms and conditions set forth in this Order (the "Post-Petition Financing").

     b.    <u>Need for Post-Petition Financing</u>.  Under the Debtor's cash flow projections, as attached to the DIP Financing Motion, Debtor does not have sufficient available sources of working capital, including Cash Collateral, to operate its business in the ordinary course of its business without the financing requested under the DIP Financing Motion. The Debtor's ability to continue caring for its patients, to maintain business relationships with vendors and suppliers, to pay employees, and to otherwise fund operations is essential to the Debtor's continued viability and is vital to the preservation and maintenance of the value of the Debtor and/or the Debtor's assets, and the Debtor's ability to conduct an orderly liquidation of its assets to maximize their value for the benefit of its patients and all creditors. Accordingly, the Debtor has an immediate need to obtain post-petition financing in order to, among other things, permit the orderly continuation of the operation of its business, minimize the disruption of business operations, and to preserve and maximize the value of the assets of the Debtor's bankruptcy estate.

     c.    <u>No Credit Available on More Favorable Terms</u>. The Debtor is unable to obtain financing in the form of unsecured credit with an administrative expense as permitted under Sections 503(b)(1) and 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant only of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets. The Debtor is unable to obtain the necessary financing on terms more favorable than the financing offered by Mission Detroit.

     d.    <u>Budget</u>. The Debtor and its management have prepared, thoroughly reviewed, and delivered to Mission Detroit a two-month Budget,[1] attached as Exhibit B to the DIP Financing Motion.

     e.    <u>Business Judgment and Good Faith</u>. The terms of this Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtor's exercise of prudent business judgment consistent with fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of this Order have been negotiated in good faith by and among the Debtor, on one hand, and Mission Detroit, on the other

---

[1] Capitalized terms used but not otherwise defined in this Order shall have the respective meanings ascribed thereto in the DIP Financing Motion.

hand, with all parties being represented by counsel. Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by Mission Detroit as that term is used in Section 364(e) of the Bankruptcy Code.

f. **Good Cause**. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor, its estate, patients and creditors. The Post-Petition Financing permitted under this Order will, among other things, provide the Debtor with the necessary liquidity to (a) minimize disruption to the Debtor's business and on-going operations, and (b) avoid the immediate and irreparable harm to the Debtor, as well as Debtor's patients, creditors, businesses, employees, and assets that would result immediate and non-orderly liquidation of the Debtor in the absence of the Post-Petition Financing.

g. **Interim Borrowing and Cash Collateral Usage**. During the first 30 days of the case the Debtor requires the use of $382,721.33 to avoid immediate and irreparable harm. The Debtor is authorized to use Cash Collateral not to exceed $382,721.33 and to borrow not more than $5,132.88 during the first thirty days of this case.

h. **Immediate Entry**. Sufficient cause exists for immediate entry of this Order as permitted under Bankruptcy Rule 4001(b)(2) and (c)(2).

i. **Objections Overruled**. No party appearing in the case has filed or made an objection to the relief sought in the Motion or the entry of this Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefore;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:**

1. **Motion Granted**. The DIP Financing Motion is granted on an interim basis. If no objections are filed, the DIP Financing Motion shall be granted on a final basis as set forth below.

2. **Authorization to Use Cash Collateral.** Debtor is hereby authorized and empowered to immediately use Cash Collateral under the terms set forth in this Order. Until this Order is entered on a final basis, Debtor may use Cash Collateral only as set forth in the Budget, with a 20% variance.

3. **Authorization to Borrow and Use Loan Proceeds**. Debtor is hereby authorized and empowered to immediately borrow and obtain loans, advances, and other credit and financial

4

accommodations from Mission Detroit under to the terms and conditions of this Order. Until this Order is entered on a final basis, Debtor may use Cash Collateral only as set forth in the Budget, with a 20% variance. In addition to repayment of the principal amount borrowed from Mission Detroit, Debtor shall be responsible to pay all fees, expenses, and costs of Mission Detroit relating to Mission Detroit's financing of Debtor (including all costs, expenses and attorneys' fees, already incurred or to be incurred, relating to the DIP Financing Motion, this Order, and any subsequent, monitoring, negotiation, and enforcement proceedings) (collectively, "Loan Expenses"), plus interest accruing at 5%. All Loan Expenses and interest shall be due on the seventh day of the following month, provided, however, that Mission Detroit may, in its sole discretion, agree to advance the amount owed for Loan Expenses and interest as payment in kind (a "PIK Advance"), in which event the PIK Advance shall be treated in all respects as any other advance by Mission Detroit and shall be payable on the same terms and accrue interest at the same rate of interest from the date of the PIK Advance.

4.     **Budget Revisions and Amendments.** If this Order is entered on a final basis, Debtor may use Cash Collateral and obtain Post-Petition Financing as set forth in the Budget, or any revised or extended Budget (which may be filed with the Court), with a cumulative 20% variance, as agreed to by Debtor, Slavik, and Mission Detroit, and as filed with this Court. If any party in interest files an objection to any revised or extended Budget, Debtor may continue to use Cash Collateral and obtain Post-Petition Financing under this Order until the objection has been resolved. Debtor may file a subsequent motion for use of cash collateral and/or financing if Debtor, Slavik, and Mission Detroit are unable to agree on a revised or extended Budget.

5.     **Post-Petition Loan Documents.** It is the intent of the Debtor, Slavik, and Mission Detroit that the terms and provisions of this Order contain all the essential terms regarding Post-Petition Financing and Debtor's use of Cash Collateral. No further documentation or recording shall be necessary for Debtor's obligations under this Order to be fully valid and enforceable, and all rights, liens, and security interests granted under this Order shall be fully effective and perfected as against all persons without the need for any recording or filing.

5

6.      **Interest Payments on Pre-Petition Debt**. The Debtor is authorized and directed to pay Slavik the amount of $9,583.33 per month, which is equal to the prepetition payment required under the applicable loan documents of the Slavik Indebtedness and shall be applied to the Slavik Indebtedness consistent with such loan documents. The Debtor is further authorized and directed to pay $2,503.00 per month to the IRS on the IRS' asserted debt, which shall be applied to interest accruing on such tax debt. To the extent that Slavik and/or the IRS are determined to be less than fully secured under Section 506(b), the Debtor may seek to have some or all payments recharacterized as principal payments. To the extent that the IRS debt is determined to be less than the amount asserted by the IRS, the excess interest payments shall be recharacterized as principal payments reducing the amount owed to the IRS.

7.      **Payments and Application of Payments**. If, at any time, the Debtor has cash in its accounts over and above what is reasonably required for Debtor's operations under the Budget, Debtor is authorized and directed to pay such excess cash ("Excess Cash") to Mission Detroit to be applied: first to accrued but unpaid Loan Expenses, second to accrued but unpaid interest, and finally to reduce the principal amount of the debt owed to Mission Detroit. All such payments shall not be avoidable or recoverable from Mission Detroit under Section 547, 548, 550, 553 or any other Section of the Bankruptcy Code, or under any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, equity, other law or otherwise. Payment in full of all Post-Petition Financing, unless extended in writing by Mission Detroit, is due on the earlier of (i) the effective date of a confirmed plan, (ii) September 2, 2016, (iii) 60 days after a Termination Event (defined below), or (iv) the acceleration of the amount owed by Debtor relating to the Post-Petition Financing as permitted in this Order.

8.      **Replacement Liens for Slavik, the IRS, and the Plan Monitor.** As adequate protection for the diminution in value of its interests in the Debtor's pre-petition assets (including Cash Collateral) on account of the Debtor's use of such assets, the imposition of the automatic stay and the other relief provided under this Order, and to the extent of such diminution, Slavik, the IRS, and the Plan Monitor are hereby granted, valid, binding, enforceable and perfected

6

replacement liens upon and security interests in all Debtor's post-petition assets under Sections 361 and 363 of the Bankruptcy Code (the "Replacement Liens"). The Replacement Liens shall have the same priority, scope, validity, and enforceability, and shall attach to the same categories of assets as Slavik's, the IRS', and the Plan Monitor's pre-petition liens and security interests as of the Petition Date.

9. **Post-Petition Lien Grant**. To secure the prompt payment and performance of any and all obligations of Debtor to Mission Detroit relating to the Post-Petition Financing of whatever kind, nature or description, absolute or contingent, Mission Detroit shall have and is hereby granted, effective as of the Petition Date, (i) valid and perfected first-priority security interests and liens, on all pre-petition and post-petition assets not otherwise encumbered by valid, enforceable, and perfected liens or security interests as of the Petition Date or under the terms of this Order, and (ii) junior liens and security interests in all other pre-petition and post-petition assets of Debtor. Notwithstanding the above, Mission Detroit's liens and security interests shall not attach to avoidance actions under Sections 544, 545, 547, 548, or 550 of chapter 5 of the Bankruptcy Code (the "Chapter 5 Avoidance Actions"). The liens granted in favor of Mission Detroit under this Order shall not be deemed or construed to prime any valid, perfected, existing, non-avoidable liens on the Debtor's assets, and shall have priority with respect to all post-petition assets over the Replacement Liens granted to Slavik and the IRS and shall have priority under section 507(b) of the Bankruptcy Code.

10. **Post-Petition Lien Perfection**. This Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) holding a depository account consisting of collateral (a "Perfection Act"). Notwithstanding the foregoing, if Slavik, the IRS, the Plan Monitor, or Mission Detroit shall, in its sole discretion, elect for any reason to file,

7

record or otherwise effectuate any Perfection Act, Slavik, the IRS, the Plan Monitor, and Mission Detroit is authorized to perform such act, and the Debtor is authorized and directed to perform and cooperate with such act to the extent necessary, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Order notwithstanding the date and time actually accomplished. The subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Slavik, the IRS, the Plan Monitor or Mission Detroit may choose to file, record or present a certified copy of this Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Final Order in accordance with applicable law. No defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the liens and security interests granted herein.

11. **Superpriority Administrative Expenses**.

      a.    For all Post-Petition Financing under this Order, including all interest and Loan Expenses, Mission Detroit is granted an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtor, whether now in existence or hereafter incurred by Debtor, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "Superpriority Claim"), but notwithstanding the Superpriority Claim, the Debtor will be entitled to make payments as specified in Paragraph 13, and such payments, once made, whether actually paid or accrued, provided that the payment is consistent with the Budget, will not be subject to disgorgement on the basis of the Superpriority Claim.

      b.    As additional adequate protection, limited to the diminution in value of their respective interests in the Debtor's pre-petition assets (if any), Slavik, the IRS, and the Plan Monitor shall have administrative expense priorities under Section 507(b), junior only to the Superpriority Claim of Mission Detroit and the Allowed Professional Fees (defined below) as set forth in the Budget whether paid or accrued. Notwithstanding the Section 507(b) priority, the Debtor will be entitled to make payments as specified in Paragraph 13, and such payments, once made, whether actually paid or accrued, provided that the payment is consistent with the Budget, will not be subject to disgorgement on the basis of Section 507(b) priority.

8

12. **Payment of Expenses**. Until an Event of Default occurs Debtor shall be permitted to make payments to be held in escrow pending approval by the Court to Allowed Professional Fees in accordance with the Budget. After an Event of Default occurs, payment of expenses, including Allowed Professional Fees, shall be governed by Section 13, and the amount of any payment by Mission Detroit towards Allowed Professional Fees (if any) shall be added to and made a part of the Debtor's post-petition obligations to Mission Detroit, secured by the liens and security interests provided in this Order. Payment of any Allowed Professional Fees by or on behalf of Mission Detroit, shall not and shall not be deemed to reduce the Debtor's liability to Mission Detroit for Post-Petition Financing, and shall not and shall not be deemed to subordinate any of Mission Detroit's liens and security interests or the Superpriority Claim. Nothing in this Order shall be construed to obligate Mission Detroit in any way, to pay compensation to or to reimburse expenses of any professional, or to ensure that the Debtor has sufficient funds to pay such compensation or reimbursement.

13. **Use of Post-Petition Financing Proceeds and Cash Collateral After Default**. Upon the declaration by Mission Detroit or Slavik of the occurrence of an Event of Default (as defined below), Debtor may continue using Cash Collateral and the proceeds of the Post-Petition Financing only for thirty days and only for the following purposes (the "Wind-Down Expenses"):

      a.    statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

      b.    fees payable to the Clerk of this Court;

      c.    the costs and expenses necessary and reasonable for Debtor to comply with all health care obligations and to transfer all patients to different facilities; and

      d.    subject to the terms and conditions of this Order, the unpaid reasonable fees and expenses, as set forth in the Budget, of attorneys, accountants and other professionals retained by the Debtor under Section 327 or 1103(a) of the Bankruptcy Code (collectively, the "Professionals") actually incurred, whether paid, escrowed, or accrued, on or after the Petition Date through thirty days after the declaration of the Event of Default, plus such fees and expenses incurred by Professionals for a period of 30-days after the declaration of the Event of Default for the limited purposes of challenging or

9

curing the Event of Default, as appropriate, assisting Debtor in complying with the requirements of subpart c, above, assisting the Debtor in obtaining alternative sources of funding, and otherwise fulfilling the Professionals' fiduciary duties to the Debtor, subject only to approval by a final order of the Court, (collectively, the "<u>Allowed Professional Fees</u>"),, less the amount of any retainers, if any, then held by such Professionals (the "<u>Professional Fee Hold Back</u>").

14.  **<u>Financial Reporting</u>.** Until satisfaction of all amounts owed to Mission Detroit and Slavik, the Debtor will provide them: a) all financial and other information reasonably requested, including, among other things, any requested bills, invoices and proofs of payment; b) maintain such fire, hazard and extended coverage insurance on all Debtor's personal property to the full replacement value and the Debtor shall designate Mission Detroit and Slavik as additional loss payee and additional insured on all such insurance policies; c) prepare and transmit to Mission Detroit and Slavik, on a monthly basis Monthly updates of the Budget and a variance report showing the actual as compared to the Budget; and d) permit Mission Detroit and Slavik during normal business hours to conduct any and all audits or reviews of Debtor's books and records and to make copies therefrom.

15.  **<u>Events of Default</u>.** The following shall be Events of Default under this Order:

a.  Any failure by Debtor to comply with any material requirement or material provision of this Order, including, but not limited to, any failure to make a payment when due to Mission Detroit, Slavik or the IRS, unless such payment is satisfied by a PIK Advance;

b.  Dismissal of this Chapter 11 case;

c.  Conversion of this Chapter 11 case to a case under Chapter 7;

d.  Appointment of a Chapter 11 trustee;

e.  Entry of an order granting any entity relief from the automatic stay, which Mission Detroit or Slavik reasonably believes may materially interfere with Debtor's business operations or materially reduce the value of the collateral securing the liens and security interests granted under this Order;

f.  Debtor's revenues fail to meet, or its expenditures exceed, the amounts set forth in the approved Budget by more than 20%, cumulative;

10

g.  Debtor's Budget shows on-going losses in an amount unacceptable to Mission Detroit or Slavik, in their sole discretion, or Debtor, Mission Detroit, and Slavik are otherwise unable to reach a good faith agreement on Budget modifications or extensions;

h.  Debtor fails to make payments as they come due in the ordinary course of business; or

i.  Confirmation of a Plan of Reorganization that does not provide for the payment in full of Mission Detroit on of the Effective Date, unless Mission Detroit consents to such treatment.

16.  **Rights and Remedies Upon Event of Default**. After a written declaration of default by Mission Detroit or Slavik to Debtor, Debtor shall have 15 days to cure the Event of Default or to obtain a ruling from the Court declaring that no default has occurred. Upon the occurrence of and during the continuance of an Event of Default not timely cured, (a) all amounts due to Mission Detroit shall become immediately due and payable and Mission Detroit shall have no further obligation to make any advances to Debtor, (b) the Debtor shall continue to be bound by all restrictions, prohibitions and other terms as provided in this Order, (c) Mission Detroit, Slavik, the IRS, and the Plan Monitor shall be entitled to take any act or exercise any right available at law or equity to collect amounts due and owing, including the enforcement of liens and security interests, and (d) the Debtor's authority to use cash collateral under this Order shall terminate. Notwithstanding the above, the Debtor may continue to use the proceeds of the Post-Petition Financing and Cash Collateral for the purposes and during the time set forth in Paragraph 13, and collection activities by any secured party shall not interfere with Debtor's actions in compliance with Paragraph 13. Notwithstanding anything to the contrary herein, the Debtor may file a motion to use Cash Collateral on an expedited basis under any terms.

17.  **Expiration of Financing**.

a.  Although not an Event of Default, Debtor's right to obtain financing from Mission Detroit will expire if any of the following occurs (each a "Termination Event"):

i.  Debtor files a Plan of Reorganization that does not pay Mission Detroit in full by the Effective Date;

11

ii.    Debtor agrees to sell or seeks authority to sell any of its bed licenses to any purchaser in a manner that does not allow Mission Detroit to be paid in full within ninety (90 days) thereof and prevents Mission Detroit or Slavik from credit bidding;

iii.    Mission Detroit fails to obtain or loses financing under its own financing commitment;

iv.    Debtor has not closed on a sale of its bed licenses to a buyer by July 1, 2016 or as may be extended by Mission Detroit.

b.    Any of the dates or termination events above may be extended with Mission Detroit's written consent, which consent shall not be implied or construed from any action, inaction or acquiescence by Mission Detroit.

c.    Upon the occurrence of a Termination Event, all of the amounts owed by Debtor to Mission Detroit relating to the Post-Petition Financing shall become immediately due.

d.    Upon indefeasible payment in full of the amounts due to Mission Detroit, Debtor shall have no further obligations to Mission Detroit under this Order.

18.    **Relief from Automatic Stay**.  The automatic stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit Mission Detroit, Slavik, the IRS, and the Plan Monitor to perform any act authorized or permitted under or by virtue of this Order. In addition, and without limiting the foregoing, upon the occurrence of an uncured Event of Default, Mission Detroit, Slavik, the IRS, and the Plan Monitor shall be entitled to seek relief from the automatic stay to take any action and exercise all rights and remedies provided to them by this Order and applicable law to, among other things, proceed against and realize upon the collateral securing their pre and post-petition claims to obtain the full and indefeasible repayment of all obligations.

19.    **Section 506(c) Claims**.  No costs or expenses of administration which have or may be incurred in this case at any time shall be charged against Mission Detroit, its claims or collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of

12

Mission Detroit, and no such consent shall be implied from any other action, inaction or acquiescence by Mission Detroit.

20. **Power to Waive Rights; Duties to Third Parties**. Mission Detroit shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Order in respect (the "Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s). Any waiver by Mission Detroit of any Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any Lender Rights shall neither constitute a waiver of such Lender Rights, subject Mission Detroit to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtor to Mission Detroit. The rights and remedies hereunder specified are cumulative and not exclusive of any rights or remedies which Mission Detroit may otherwise have.

21. **Disposition of Collateral**. Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any of its assets outside Debtor's ordinary course of business without an order of this Court and notice to Mission Detroit.

22. **Reservation of Rights**. The terms, conditions and provisions of this Order are in addition to and without prejudice to the rights of Mission Detroit, Slavik, the IRS, and the Plan Monitor to pursue any and all rights and remedies not otherwise inconsistent with the terms of this Order under the Bankruptcy Code or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in Debtor's assets or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estate.

13

23.     **Binding Effect**.

        a.      The provisions of this Order and all rights, remedies, privileges and benefits in favor of Mission Detroit, Slavik, the IRS, and the Plan Monitor provided or acknowledged in this Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Order, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting the case to any other chapter under the Bankruptcy Code, or dismissing the case.

        b.      This Order shall be binding upon Debtor, all parties in interest in the Chapter 11 bankruptcy case and their respective successors and assigns, including any trustee or any subsequently converted bankruptcy case of the Debtor. This Order shall also inure to the benefit of Mission Detroit, Slavik, the IRS, the Plan Monitor, Debtor and their respective successors and assigns.

24.     **No Owner/Operator Liability**.     In determining to make any post-petition advance under this Order, or in exercising any rights or remedies as and when permitted pursuant to this Order, Mission Detroit shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor.

25.     **Marshalling**.  In no event shall Mission Detroit, Slavik, the IRS, or the Plan Monitor be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to its collateral.

26.     **Notice**. Notice of this Order shall be given by Debtor via first class mail within 24 hours of its entry under Federal Rule of Bankruptcy Procedure 4001(d) and LBR 4001-2.

27.     **Quality Assessment & Assurance Payments**.  Notwithstanding anything else in this Order, upon any default of the Debtor, and failure to cure such default within twenty (20) days of receipt of such notice from Michigan Department of Community Health ("DCH"), then DCH may take any such actions against the Debtor allowable under applicable non-bankruptcy law, rules, and regulations, to enforce its rights against the Debtor under such laws, rules and regulations, and notwithstanding any automatic stay or plan injunction that would be otherwise

14

applicable, relief from any such stay or injunction shall be deemed granted to DCH upon the occurrence of a default in the payment of the current bed tax and the failure to cure such default within twenty (20) days; however, such rights are limited to (i) DCH's right to recoup any Quality Assessment & Assurance ("QAA") payments that the Debtor currently owes or may incur for current bed taxes from any outgoing Medicaid reimbursement payments otherwise owing to the Debtor in the event of a default by the Debtor that is not cured within twenty (20) days from the Debtor receipt of notice of such default from DCH and (ii) DCH's rights to setoff and recoupment under applicable non-bankruptcy law shall not be impaired by this Order, except as otherwise set forth in this paragraph.

28. **Other Costs and Fees**. The Debtor shall pay quarterly fees to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a). The Debtor shall also pay all required fees on account of any patient care ombudsman appointed in this case.

29. **Objection Procedures**:

    a.     The deadline to file an objection to this Order is 14 days from the entry of this Order, except that an official committee may file objections within 14 days after it is served with the entered order;

    b.     If an objection is timely filed, the final hearing will be held as required by L.B.R. 4001-2 on _____, 2016 at ____, _.m., at 211 W. Fort St., Courtroom ____, Detroit, Michigan 48226; and

    c.     If no objection is timely filed, this Order may become a final order.



EXHIBIT B

# St. Francis Nursing Center
## Budget

Accrual Basis

| | Two Months Total | Feb-16 | Mar-16 |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| **40010 · MEDICAID REVENUE** | | | |
| 40011 · Medicaid Billed | 553,239.37 | 276,619.69 | 276,619.69 |
| 40013 · Bed Tax Revenue | 109,470.00 | 54,735.00 | 54,735.00 |
| Total 40010 · MEDICAID REVENUE | 662,709.37 | 331,354.69 | 331,354.69 |
| **40020 · MEDICARE REVENUE** | | | |
| 40021 · Medicare A Billed | 43,725.00 | 21,862.50 | 21,862.50 |
| 40022 · Contractual Allowance | (5,630.37) | (2,815.19) | (2,815.19) |
| Total 40020 · MEDICARE REVENUE | 38,094.63 | 19,047.31 | 19,047.31 |
| **40030 · PATIENT REVENUE** | | | |
| 40031 · Patient Billed | 52,963.37 | 26,481.68 | 26,481.68 |
| Total 40030 · PATIENT REVENUE | 52,963.37 | 26,481.68 | 26,481.68 |
| 40039 · Contractual-3rd Party | 32,519.41 | 16,259.70 | 16,259.70 |
| **40100 · PHYSICAL THERAPY REVENUE** | | | |
| 40101 · Physical Therapy-Part A | 29,266.67 | 14,633.33 | 14,633.33 |
| 40102 · Physical Therapy-Part B | 5,600.00 | 2,800.00 | 2,800.00 |
| Total 40100 · PHYSICAL THERAPY REVENUE | 34,866.67 | 17,433.33 | 17,433.33 |
| **40110 · OCCUPATIONAL THERAPY** | | | |
| 40111 · Occupational Therapy-Part A | 28,316.67 | 14,158.33 | 14,158.33 |
| 40112 · Occupational Therapy-Part B | 5,133.33 | 2,566.67 | 2,566.67 |
| Total 40110 · OCCUPATIONAL THERAPY | 33,450.00 | 16,725.00 | 16,725.00 |
| **40120 · SPEECH THERAPY** | | | |
| 40121 · Speech Therapy-Part A | 916.67 | 458.33 | 458.33 |
| 40122 · Speech Therapy-Part B | 891.67 | 445.83 | 445.83 |
| Total 40120 · SPEECH THERAPY | 1,808.33 | 904.17 | 904.17 |
| **Total Income** | 856,411.78 | 428,205.89 | 428,205.89 |

# St. Francis Nursing Center
## Budget

| | Two Months Total | Feb-16 | Mar-16 |
|---|---|---|---|
| **Cost of Goods Sold** | | | |
| **50100 · ANCILLARY PHYSICAL THERAPY** | | | |
| 50101 · PT-Medicare-Part A | 10,316.00 | 5,158.00 | 5,158.00 |
| 50102 · PT-Medicare-Part B | 2,239.87 | 1,119.93 | 1,119.93 |
| 50103 · PT-Medicaid | 1,191.77 | 595.89 | 595.89 |
| 50104 · PT-Great Lakes | 78.75 | 39.38 | 39.38 |
| 50108 · PT-Medicaid HMO | 503.04 | 251.52 | 251.52 |
| 50109 · PT-Other Insurances | 4,483.09 | 2,241.55 | 2,241.55 |
| **Total 50100 · ANCILLARY PHYSICAL THERAPY** | 18,812.52 | 9,406.26 | 9,406.26 |
| **50110 · ANCILLARY OCCUPATIONAL THERAPY** | | | |
| 50111 · OT-Medicare-Part A | 7,401.08 | 3,700.54 | 3,700.54 |
| 50112 · OT-Medicare Part B | 2,326.37 | 1,163.19 | 1,163.19 |
| 50113 · OT-Medicaid | 1,217.98 | 608.99 | 608.99 |
| 50114 · OT-Great Lakes | 60.00 | 30.00 | 30.00 |
| 50118 · OT-Medicaid HMO | 572.59 | 286.30 | 286.30 |
| 50119 · OT-Other Insurances | 4,326.93 | 2,163.46 | 2,163.46 |
| **Total 50110 · ANCILLARY OCCUPATIONAL THERAPY** | 15,904.95 | 7,952.47 | 7,952.47 |
| **50150 · ANCILLARY SPEECH THERAPY** | | | |
| 50151 · ST-Medicare-Part A | 469.49 | 234.74 | 234.74 |
| 50152 · ST-Medicare-Part B | 633.87 | 316.94 | 316.94 |
| 50153 · ST-Medicaid | 253.13 | 126.56 | 126.56 |
| 50155 · ST-Hospice | 33.75 | 16.88 | 16.88 |
| 50157 · ST-BCBS PPS Track | 167.10 | 83.55 | 83.55 |
| **Total 50150 · ANCILLARY SPEECH THERAPY** | 1,557.33 | 778.67 | 778.67 |
| **50200 · ANCILLARY PHARMACY** | | | |
| 50201 · Pharmacy-Medicare Part A | 10,002.45 | 5,001.23 | 5,001.23 |
| 50203 · Pharmacy-Medicaid | 4,375.81 | 2,187.90 | 2,187.90 |
| 50205 · Pharmacy-Other | (614.28) | (307.14) | (307.14) |
| 50207 · Pharmacy-Insurance Pending | 4,281.96 | 2,140.98 | 2,140.98 |

# St. Francis Nursing Center
## Budget

| | Two Months Total | Feb-16 | Mar-16 |
|---|---|---|---|
| 50208 · Pharmacy-Mgmt | 810.00 | 405.00 | 405.00 |
| Total 50200 · ANCILLARY PHARMACY | 18,855.93 | 9,427.96 | 9,427.96 |
| 50210 · ANCILLARY X-RAY | | | |
| 50211 · X-Ray-Medicare-Part A | 497.69 | 248.84 | 248.84 |
| Total 50210 · ANCILLARY X-RAY | 497.69 | 248.84 | 248.84 |
| 50230 · ANCILLARY LAB | | | |
| 50231 · Lab-Medicare Part A | 483.83 | 241.91 | 241.91 |
| Total 50230 · ANCILLARY LAB | 483.83 | 241.91 | 241.91 |
| 50240 · OTHER PATIENT COSTS | | | |
| 50242 · Patient Transportation | 5,024.88 | 2,512.44 | 2,512.44 |
| 50245 · Other Patient Costs | 191.24 | 95.62 | 95.62 |
| Total 50240 · OTHER PATIENT COSTS | 5,216.12 | 2,608.06 | 2,608.06 |
| Total COGS | 61,328.36 | 30,664.18 | 30,664.18 |
| Gross Profit | 795,083.42 | 397,541.71 | 397,541.71 |
| Expense | | | |
| 60000 · ACTIVITIES DEPARTMENT | | | |
| 60060 · Diversional Act Supp | 603.11 | 301.55 | 301.55 |
| 60800 · Activities Payroll | | | |
| 60805 · Activities Wages | 12,113.21 | 6,056.60 | 6,056.60 |
| Total 60800 · Activities Payroll | 12,113.21 | 6,056.60 | 6,056.60 |
| Total 60000 · ACTIVITIES DEPARTMENT | 12,716.31 | 6,358.16 | 6,358.16 |
| 61000 · DIETARY DEPARTMENT | | | |
| 61005 · Food | 28,390.35 | 14,195.18 | 14,195.18 |
| 61050 · Dietary Supplies | 3,754.73 | 1,877.37 | 1,877.37 |
| 61800 · Dietary Payroll | | | |
| 61805 · Dietary Wages | 38,095.07 | 19,047.53 | 19,047.53 |
| Total 61800 · Dietary Payroll | 38,095.07 | 19,047.53 | 19,047.53 |
| Total 61000 · DIETARY DEPARTMENT | 70,240.15 | 35,120.07 | 35,120.07 |

## St. Francis Nursing Center
### Budget

| | Two Months Total | Feb-16 | Mar-16 |
|---|---|---|---|
| **62000 · HOUSEKEEPING DEPARTMENT** | | | |
| 62050 · Housekeeping Supplies | 2,596.80 | 1,298.40 | 1,298.40 |
| 62800 · Housekeeping Payroll | | | |
| 62805 · Housekeeping Wages | 9,653.10 | 4,826.55 | 4,826.55 |
| Total 62800 · Housekeeping Payroll | 9,653.10 | 4,826.55 | 4,826.55 |
| **Total 62000 · HOUSEKEEPING DEPARTMENT** | 12,249.89 | 6,124.95 | 6,124.95 |
| **63000 · LAUNDRY DEPARTMENT** | | | |
| 63005 · Linen | 1,132.90 | 566.45 | 566.45 |
| 63060 · Laundry Supplies | 1,837.96 | 918.98 | 918.98 |
| 63800 · Laundry Payroll | | | |
| 63805 · Laundry Wages | 15,526.61 | 7,763.31 | 7,763.31 |
| Total 63800 · Laundry Payroll | 15,526.61 | 7,763.31 | 7,763.31 |
| **Total 63000 · LAUNDRY DEPARTMENT** | 18,497.48 | 9,248.74 | 9,248.74 |
| **64000 · MAINTENANCE DEPARTMENT** | | | |
| 64005 · Service Contracts | 2,813.02 | 1,406.51 | 1,406.51 |
| 64010 · Repairs & Maintenance | 2,302.18 | 1,151.09 | 1,151.09 |
| 64060 · Maintenance Supplies | 1,037.16 | 518.58 | 518.58 |
| 64800 · Maintenance Payroll | | | |
| 64805 · Maintenance Wages | 29,669.89 | 14,834.95 | 14,834.95 |
| Total 64800 · Maintenance Payroll | 29,669.89 | 14,834.95 | 14,834.95 |
| **Total 64000 · MAINTENANCE DEPARTMENT** | 35,822.25 | 17,911.13 | 17,911.13 |
| **65000 · RECORDS DEPARTMENT** | | | |
| 65800 · Records Payroll | | | |
| 65805 · Medical Records Wages | 5,872.79 | 2,936.40 | 2,936.40 |
| Total 65800 · Records Payroll | 5,872.79 | 2,936.40 | 2,936.40 |
| **Total 65000 · RECORDS DEPARTMENT** | 5,872.79 | 2,936.40 | 2,936.40 |
| **66000 · NURSING DEPARTMENT** | | | |
| 66050 · Nursing Supplies | 23,078.92 | 11,539.46 | 11,539.46 |
| 66065 · Restock Fee | 442.05 | 221.02 | 221.02 |
| 66800 · Nursing Payroll | | | - |
| 66805 · DON Wages | 10,030.00 | 5,015.00 | 5,015.00 |
| 66810 · CNA Wages | 97,338.34 | 48,669.17 | 48,669.17 |

16-41554-tjt   Doc 8   Filed 02/08/16   Entered 02/08/16 16:33:38   Page 38 of 40

# St. Francis Nursing Center
## Budget

| | Two Months Total | Feb-16 | Mar-16 |
|---|---|---|---|
| 66815 · LPN Wages | 108,776.68 | 54,388.34 | 54,388.34 |
| 66820 · RN Wages | 23,836.88 | 11,918.44 | 11,918.44 |
| Total 66800 · Nursing Payroll | 239,981.90 | 119,990.95 | 119,990.95 |
| Total 66000 · NURSING DEPARTMENT | 263,502.87 | 131,751.44 | 131,751.44 |
| 69000 · SOCIAL SERVICES DEPARTMENT | | | |
| 69800 · Social Services Payroll | | | |
| 69805 · Social Services Wages | 5,498.18 | 2,749.09 | 2,749.09 |
| Total 69800 · Social Services Payroll | 5,498.18 | 2,749.09 | 2,749.09 |
| Total 69000 · SOCIAL SERVICES DEPARTMENT | 5,498.18 | 2,749.09 | 2,749.09 |
| 80000 · ADMINISTRATION DEPARTMENT | | | |
| 80005 · Office Supplies | 1,576.10 | 788.05 | 788.05 |
| 80010 · Computer Expenses | 2,015.51 | 1,007.76 | 1,007.76 |
| 80020 · Dues & Subscriptions | 1,684.40 | 842.20 | 842.20 |
| 80025 · Licenses & Permits | 1,439.87 | 719.93 | 719.93 |
| 80030 · Quality Assurance Assessment | | | |
| 80031 · Bed Tax | 94,344.16 | 47,172.08 | 47,172.08 |
| Total 80030 · Quality Assurance Assessment | 94,344.16 | 47,172.08 | 47,172.08 |
| 80040 · Seminars | 457.17 | 228.58 | 228.58 |
| 80045 · Telephone | 1,384.56 | 692.28 | 692.28 |
| 80060 · Bank Service Charges | 120.00 | 60.00 | 60.00 |
| 80075 · Automobiles | - | - | - |
| 80085 · Advertising | 667.90 | 333.95 | 333.95 |
| 80090 · Penalties/Late Fees | - | - | - |
| 80095 · Miscellaneous | - | - | - |
| 80100 · Utilities | 14,489.72 | 7,244.86 | 7,244.86 |
| 80300 · Professional Fees | | | |
| 80305 · Management Fees | 48,000.00 | 24,000.00 | 24,000.00 |
| 80310 · Accounting Fees | 900.00 | 450.00 | 450.00 |
| 80315 · Legal Fees | | | |
| 80315.1 · Medicaid Counsel | 1,500.00 | 750.00 | 750.00 |
| Total 80315 · Legal Fees | 1,500.00 | 750.00 | 750.00 |
| 80320 · Other Professional Fees | 250.00 | 125.00 | 125.00 |
| Total 80300 · Professional Fees | 50,650.00 | 25,325.00 | 25,325.00 |
| 80400 · Insurance-General Liability | 14,619.66 | 7,309.83 | 7,309.83 |
| 80405 · Professional Liability | 3,704.34 | 1,852.17 | 1,852.17 |
| 80410 · Workers Comp Ins | 10,725.95 | 5,362.98 | 5,362.98 |

# St. Francis Nursing Center
## Budget

Accrual Basis

| | Two Months Total | Feb-16 | Mar-16 |
|---|---|---|---|
| 80415 · Insurance-Property | 1,313.98 | 656.99 | 656.99 |
| 80500 · Real Property Tax | 8,338.84 | 4,169.42 | 4,169.42 |
| 80505 · Personal Property Tax | 385.94 | 192.97 | 192.97 |
| 80800 · Administration Payroll | | | |
| 80805 · Administration Wages | 32,731.41 | 16,365.71 | 16,365.71 |
| 80810 · Office Wages | 15,487.65 | 7,743.83 | 7,743.83 |
| 80850 · Payroll Taxes | | | |
| 80851 · FICA | 30,438.87 | 15,219.44 | 15,219.44 |
| 80852 · FUTA | 773.89 | 386.95 | 386.95 |
| 80853 · MESC | 17,914.49 | 8,957.24 | 8,957.24 |
| Total 80850 · Payroll Taxes | 49,127.25 | 24,563.63 | 24,563.63 |
| 80890 · Employee Benefits | 252.18 | 126.09 | 126.09 |
| 80895 · Health Insurance | 21,062.27 | 10,531.13 | 10,531.13 |
| 80896 · Life Insurance | 197.74 | 98.87 | 98.87 |
| Total 80800 · Administration Payroll | 118,858.50 | 59,429.25 | 59,429.25 |
| Total 80000 · ADMINISTRATION DEPARTMENT | 326,776.58 | 163,388.29 | 163,388.29 |
| Total Expense | 751,176.51 | 375,588.25 | 375,588.25 |
| Net Ordinary Income | 43,906.91 | 21,953.45 | 21,953.45 |
| Other Income/Expense | | | |
| Other Expense | | | |
| 98100 · Interest Slavik Enterprises | 19,166.67 | 9,583.33 | 9,583.33 |
| 98110 · Reserved | - | - | - |
| 98400 · Debtor Counsel | 30,000.00 | 15,000.00 | 15,000.00 |
| 984500 IRS Adequate Protection | 5,006.00 | 2,503.00 | 2,503.00 |
| Total Other Expense | 54,172.67 | 27,086.33 | 27,086.33 |
| Total Other Income | 54,172.67 | 27,086.33 | 27,086.33 |
| Net Other Income | (54,172.67) | (27,086.33) | (27,086.33) |
| Net Income | (10,265.76) | (5,132.88) | (5,132.88) |